IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONALD JOSEPH BERRY,

                          Petitioner,

                    vs.

RON DAVIS, Warden, Valley State
Prison,[1]

                          Respondent.

No. 2:10-cv-00305-JKS

MEMORANDUM DECISION

Donald Joseph Berry, a state prisoner proceeding through appointed counsel, filed a

Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Berry is

currently in the custody of the California Department of Corrections and Rehabilitation and is

incarcerated at Valley State Prison.  Respondent has answered, and Berry has replied.

I. BACKGROUND/PRIOR PROCEEDINGS[2]

In resolving Berry's claims on direct appeal, the California Court of Appeal recounted

the factual background of this case as follows:

> [Anona Lorraine] Wine moved to Hayfork, California sometime around 2002 or
> 2003 to live with her mother.  Eventually, she and [Berry] moved in together.  By all
> accounts, their relationship was stormy.

---

[1]      Ron Davis, Warden, Valley State Prison, is substituted for Francisco Jacquez,
former Warden, Pelican Bay State Prison.  FED. R. CIV. P. 25(c).

[2]      The Court's understanding of the record, including the jury instructions, the
arguments, and the law, has been greatly helped by the fine work done by counsel for the
parties—John Balazs, representing Berry, and Kamala Harris, Catherine Chatman, and R. Todd
Marshall, representing Respondent.  Their mastery of the record and relevant law points out the
value of appointed counsel in habeas cases, which, unfortunately, is altogether too rare.

In September 2005, Wine was involved in a car accident that left her in a coma for several weeks. She suffered a traumatic brain injury that affected her speech, memory, and mobility. When Wine was first released from the hospital, her mother cared for her, but after a few months, Wine moved to Redding, where she was cared for by her daughter, son, and her daughter's father, William Cote.

Sometime in June 2006, Wine moved back to Hayfork to live with [Berry]. At the time of Wine's murder, she was living with [Berry] at the Stokke Ranch in Hayfork. She had recovered some from her injuries, but she still had problems with her speech, balance, and generally with taking care of herself. Wine and [Berry] shared the care taking duties for the Stokke Ranch with Jerry Allen, who lived at the ranch in his recreational vehicle. Jerry's brother, Richard, lived in the RV as well.

Around 5:00 or 6:00 [in] the evening of January 23, 2007, Jerry Allen saw Wine and [Berry] when he left some food at their house. About an hour later, Jerry went to the local bar to have pizza, drink beer, and play pool. Around 8:00 or 9:00 p.m., Jerry went back to the ranch house to invite [Berry] and Wine to join him at the bar. He went into the house without knocking, and saw [Berry] standing over Wine with a shotgun. [Berry] was holding the gun as if he had just struck Wine with it, but Jerry testified he did not see [Berry] strike Wine. However, during a taped interview that occurred shortly after the incident, Jerry told detectives that he saw [Berry] hit Wine in the head twice with the butt of a shotgun.

[Berry] told Jerry that Wine had fallen and he was just helping her get up. [Berry] told Jerry that they would come to the bar.

When Jerry had been at the bar an hour or so, [Berry] showed up at the bar alone and stayed 20 or 30 minutes. [Berry] had a strange expression on his face that made Jerry feel eerie and scared. Jerry left the bar around 10:30 or 11:00 that night.

After Jerry got home, his brother Richard Allen left to go to [Berry's] house to get some tobacco. Richard came back and told Jerry that Wine needed help. Richard said Wine was lying on the floor and her pants were wet.

Jerry went into the house, and saw Wine propped up against the refrigerator. Wine's face looked like it had been badly beaten, and she was not breathing. Jerry administered CPR, and Wine started breathing. Jerry saw [Berry] walking around with the shotgun. Jerry could not call 911 from the house because the telephone was not on the counter where it usually was.

[Berry] had opened the shotgun, and appeared to be looking for a shell. Jerry pushed the shotgun out of [Berry's] hands, and the gun appeared to break. Jerry told [Berry] he was going to get help. As he left the house, he heard [Berry] saying "No, Jerry, no, no." Jerry drove to the police substation where he was able to get help.

When Deputy Ron Whitman reached the house, Wine had a pulse, but she was not breathing. Her face was black, her right eye was badly bruised, and she had a swollen lip. Wine never regained consciousness, and was declared brain dead the next day.

The cause of Wine's death was multiple blunt force injuries to her head. The injuries were to all areas of the head—the front, the back, the top, and the sides. She had three or four contusions on the top of the head, indicating as many blows to the top of the head. A blood test revealed she had nothing in her system other than a low level (below

therapeutic range) of [V]alium.  Wine had multiple other bruises and contusions on other
parts of her body.  Some of the injuries were older.  A large chunk of her hair had been
pulled out.

 [Berry] testified that when he got home from the bar, he and Wine argued.  She
jumped up from the couch, and he pushed her back down.  She lunged back up, and
swung at him with a blunt-pointed pair of scissors.  He grabbed the scissors out of her
hand and threw them away.  He testified that the scissors really "set [him] off."  He could
not believe she had the gall to try to stab him after all he had done for her.  At this point,
he had lost his temper beyond the point where he was in control of himself.  [Berry]
grabbed Wine by the hair, spun her around, and pushed her hard.  When he pushed her, a
clump of her hair pulled out.

 At some point after pushing her down, he noticed she was lying on the floor and
not getting up, even though her eyes were open.  He reached down and slapped her once
on the face because he thought she was faking unconsciousness.  She did not respond, so
he started slapping her more.

 [Berry] testified that from the time he grabbed Wine's hair she had "relinquished
doing anything."  He had gained control of her, but lost control of himself.  When he had
her hair, she had given up and was not fighting anymore.

 When he heard a knock at the door, he got his shotgun, went to the door, and saw
that it was Jerry.  He took the butt of the shotgun and moved Wine's head with it to show
Jerry that she was not waking up.

*People v. Berry*, No. C058321, 2009 WL 3247371, at *1-3 (Cal. Ct. App. Oct. 9, 2009).

 A jury found Berry not guilty of first degree murder, but guilty of second degree murder,

corporal injury on a cohabitant, and assault with a firearm.  *Id*. at *1.  The jury also found true

the special allegations that Berry personally used a firearm and personally inflicted great bodily

injury in committing corporal injury of a cohabitant and assault.  *Id*.  The trial court sentenced

Berry to an aggregate term of 25 years to life (15 years to life for second degree murder plus 10

years for the personal use of a firearm enhancement), and stayed the terms for the remaining

counts and enhancements.  *Id*.

 Through counsel, Berry appealed, arguing that: 1) the trial court improperly instructed

the jury on mutual combat; 2) the trial court improperly instructed the jury on felony murder; 3)

the trial court erroneously permitted the introduction of expert testimony on battered women's

syndrome and Stockholm syndrome; 4) the trial court erred in excluding a statement Berry made to a defense investigator; 5) his conviction should be reversed due to cumulative errors; 6) the three upper term sentences were imposed without an adequate statement of reasons and in violation of his Sixth Amendment right to a jury trial; and 7) the abstract of judgment was incorrect.  The Court of Appeal directed the trial court to correct the abstract and affirmed the judgment of conviction in all other respects in a reasoned, unpublished opinion.  *Id*. at *10.

Berry filed a counseled petition for review to the California Supreme Court, arguing that: 1) the trial court improperly instructed the jury on felony murder; 2) the trial court improperly instructed the jury on mutual combat; and 3) the trial court erred in excluding a statement Berry made to a defense investigator.  The California Supreme Court summarily denied review.

Berry timely filed a *pro se* Petition with this Court on January 27, 2010, and Respondent answered.  Berry then filed a motion for the appointment of counsel, in which he claimed that he was "totally unable," without the assistance of counsel, "to communicate rationally with this Court."  The Court, through a previously assigned magistrate judge, denied Berry's motion. Berry subsequently filed a "notice of objection" to the Court's denial of his request for counsel as well as a request for a competency hearing.  The Court appointed counsel and denied the motion for a competency hearing.  Berry then filed a counseled Amended Petition as well as a motion for a stay and abeyance so that he could return to state court to raise several ineffective assistance of counsel claims.  The Court granted the stay and abeyance, and after the California Supreme Court summarily denied Berry's exhaustion petition, Berry filed a memorandum of law in support of his Amended Petition which included his recently exhausted claims.

## II. GROUNDS RAISED

In his counseled Amended Petition to this Court, Berry raises the following claims: 1) the trial court improperly instructed the jury on felony murder; 2) the trial court improperly instructed the jury on mutual combat; 3) he was deprived of his right to the effective assistance of counsel on multiple grounds; and 4) the cumulative effect of errors denied him due process and the right to a fair trial.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] applied] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

IV. DISCUSSION

A.  *Strickland* standard of review

Berry raises a number of ineffective assistance of counsel claims.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Thus, Berry must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard. *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

B. Merits

       Claim one: CALJIC 8.51, the alleged felony murder instruction

California Penal Code § 187(a) defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought."  "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder."  *People v. Sarun Chun*, 203 P.3d 425, 429 (Cal. 2009).  Malice may be express or implied.  *Id.*  It is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature."  *Id.* (quoting CAL. PENAL CODE § 188).  It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  *Id.* (quoting CAL. PENAL CODE § 188).  With respect to the statutory definition of implied malice, the California Supreme Court has recognized:

> This definition of implied malice is quite vague.  Trial courts do not instruct the jury in the statutory language of an abandoned and malignant heart.  Doing so would provide the jury with little guidance.  "The statutory definition of implied malice has never proved of much assistance in defining the concept in concrete terms."  (*People v. Dellinger* (1989) 49 Cal. 3d 1212, 1217, 264 Cal. Rptr. 841, 783 P.2d 200.)  Accordingly, the statutory definition permits, even requires, judicial interpretation.  We have interpreted implied malice as having "both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to human life.'  (*People v. Watson* (1981) 30 Cal. 3d 290, 300[, 179 Cal. Rptr. 43, 637 P.2d 279].)  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'  (*Ibid.*, internal quotation marks omitted.)"  (*People v. Patterson* (1989) 49 Cal. 3d 615, 626, 262 Cal. Rptr. 195, 778 P.2d 549 (lead opn of Kennard, J.) (*Patterson*).)

*Id.* at 429 (footnote omitted).

       In some cases, a defendant may also be found guilty under the felony murder rule.  "The felony-murder rule makes a killing while committing certain felonies murder without the

necessity of further examining the defendant's mental state." *Id*. at 430. "First degree felony murder is a killing during the course of a felony specified in [California Penal Code §] 189, such as rape, burglary, or robbery." *Id*.  In contrast, "[s]econd degree felony murder is an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189." *Id*. (citation and internal quotation marks omitted).  With respect to second degree murder, the felony murder rule "acts as a substitute" for conscious-disregard-for-life malice; it "imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to life." *Id*. at 431-32 (citations omitted).  "The *physical* requirement, however, remains the same; by committing a felony inherently dangerous to human life, the defendant has committed an act, the natural consequences of which are dangerous to life." *Id*. at 430 (citation and internal quotation marks omitted).

The State's primary argument was that Berry was guilty of first degree premeditated murder.  The jury was thoroughly instructed on murder, manslaughter, and various assaultive crimes.  Homicide was defined in CALJIC 8.00 as the lawful or unlawful killing of another.  Murder was defined in CALJIC 8.10 as an unlawful killing with malice aforethought.  The jury was charged with second degree murder and various degrees of manslaughter and assault as lesser included offenses.  Specifically, the jury was charged with CALJIC 8.31, which sets forth the requirements for second degree implied malice murder and states that second degree murder is also the unlawful killing of a human being when: 1) "[t]he killing resulted from an intentional act"; 2) "[t]he natural consequences of the act are dangerous to human life"; and 3) "[t]he act was deliberately performed with knowledge of the danger to, and with conscious disregard for,

human life.   [¶]   When the killing is the direct result of such an act, it is not necessary to prove

that the defendant intended that the act would result in the death of a human being."   The jury

was also charged with CALJIC 8.50 and 8.51, two companion instructions which distinguish

manslaughter from murder.   CALJIC 8.50 states as follows:

> The distinction between murder [other than felony-murder] and manslaughter is that
> murder [other than felony-murder] requires malice while manslaughter does not.

> When the act causing the death, though unlawful, is done [in the heat of passion or is
> excited by a sudden quarrel that amounts to adequate provocation,] [or] [in the actual but
> unreasonable belief in the necessity to defend against imminent peril to life or great
> bodily injury,] the offense is manslaughter.   In that case, even if an intent to kill exists,
> the law is that malice, which is an essential element of murder, is absent.

> To establish that a killing is a murder [other than felony-murder] and not manslaughter,
> the burden is on the People to prove beyond a reasonable doubt each of the elements of
> murder and that the act which caused the death was not done [in the heat of passion or
> upon a sudden quarrel] [or] [in the actual, even though unreasonable, belief in the
> necessity to defend against imminent peril to life or great bodily injury].

The written version of CALJIC 8.50 provided to the jury omitted any reference to felony

murder.   CALJIC 8.51, as given to the jury, states:

> If a person causes another's death, while committing a felony which is dangerous to
> human life, the crime is murder.   If a person causes another's death, while committing a
> misdemeanor or infraction which is dangerous to human life under the circumstances of
> its commission, the crime is involuntary manslaughter.

> There are many acts which are lawful but nevertheless endanger human life.   If a person
> causes another's death by doing or engaging in conduct in a criminally negligent manner,
> without realizing the risk involved, he is guilty of involuntary manslaughter.   If, on the
> other hand, the person realized the risk and acted in total disregard of the danger to life
> involved, malice is implied, and the crime is murder.

The "use notes" which follow CALJIC 8.51 state that "[t]his instruction should not be

given in a second degree felony-murder prosecution in which the felony has merged into the

homicide."   This is such a case and this is the error noted by the California Court of Appeal.

CALJIC 8.32, the pattern instruction which defines felony murder, states as follows:

The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as the direct causal result of the commission [or attempted commission] of the crime of _____ is murder of the second degree where the perpetrator had the specific intent to commit that crime.

The specific intent to commit_____and the commission or attempted commission of that crime must be proved beyond a reasonable doubt.

Notably, the trial court did *not* instruct the jury with CALJIC 8.32.  The jury ultimately acquitted Berry of first degree murder, but found him guilty of second degree murder.  The verdict was a general one and did not require the jury to disclose whether it found Berry guilty on a theory of express malice, implied malice, or second degree felony murder, where malice is imputed as a result of the commission or attempted commission of a felony inherently dangerous to human life.

Berry argues that it was error for the trial court to instruct the jury with the first line of CALJIC 8.51, which he characterizes as a felony murder instruction.[3]  Berry claims that his

---

[3]        Berry focuses his argument on the contention that CALJIC 8.51, in context, was a felony murder instruction.  The California Court of Appeals also called it a felony murder instruction.  *Berry*, 2009 WL 3247371, at *4.  This appears to be a mischaracterization of CALJIC 8.51.  As will be pointed out later in this decision, California pattern criminal jury instructions address felony murder either by modifying CALJIC 8.10, as was done in *Suniga v. Bunnell*, 998 F.2d 664, 666 (9th Cir. 1993), *overruled by Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam), or probably more commonly by giving CALJIC 8.32, the pattern felony murder instruction.  In either case, the instructions inform the jury that felony murder and murder with malice aforethought are alternate theories and if a specific crime identified in the instructions is committed then a resulting death is murder.  The jury in this case was never given full instructions on felony murder, which was not a theory directly presented to the jury.  Specifically, CALJIC 8.10 was given without a mention of felony murder, and CALJIC 8.32 was not given at all.  Rather, despite warnings in the use notes to the pattern jury instructions, CALJIC 8.51 was given to the jury at the request of the prosecutor and without objection by the defense to distinguish murder from manslaughter.  The significance of this error is discussed at length hereafter.

Fourteenth Amendment Due Process rights were violated because the first line of CALJIC 8.51 permitted the jury to ignore the instructions relating to express and implied malice if the other elements of second degree felony murder were met—i.e., if the jury found that Berry intentionally committed a felony inherently dangerous to human life.  The Court of Appeal found that the instruction was erroneous as a matter of state law because it was inconsistent with the merger doctrine set forth in *Sarun Chun*, 203 P.3d at 443, and *People v. Ireland*, 450 P.2d 580, 590 (1969).  *Berry*, 2009 WL 3247371, at *4.  Under the merger doctrine, "[w]hen the underlying felony is assaultive in nature, . . . the felony merges with the homicide and cannot be the basis of a felony-murder instruction."  *Sarun Chun*, 203 P.3d at 443.  The Court of Appeal in this case found that because corporal injury of a cohabitant and assault with a firearm were assaultive felonies, they merged with the murder charge and thus it was error to give a felony murder instruction.  *Berry*, 2009 WL 3247371, at *5.  The court nevertheless found the error harmless because "[t]he element of implied malice is implied from [Berry's] intent to assault and inflict corporal injury on Wine coupled with the circumstance that she died from the injuries so inflicted."  *Id*. at *7 (citing *People v. Swain*, 909 P.2d 994, 998-99 (Cal. 1996)).

This Court is thus faced with three issues.  First, was the state law error also an error of federal law—i.e., a deprivation of due process sufficient to entitle Berry to relief unless the error is harmless under federal law, applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993)?  Second, if and only if there was a federal constitutional error, was the error harmless under Justice Scalia's adaptation of harmless error analysis as set forth in his concurring opinion in *California v. Roy*, 519 U.S. 2, 7 (1996) (Scalia, J., concurring)?  This test, which the Court will refer to as "the Scalia test," was applied to a similar issue in *Sarun Chun*, 203 P.3d at 446, and followed by the

California Court of Appeal in this case, *Berry,* 2009 WL 3247371, at *6, and is similar to the

approach to harmless error analysis in related cases followed in *Suniga*, 998 F.2d at 670

(concluding that the court cannot find harmless error based on overwhelming evidence of the

issue).   Third, if there was a constitutional error, was it harmless according to the test set forth in

*Neder v. United States*, 527 U.S. 1, 18-20 (1999) (rejecting the Scalia test and concluding instead

that the omission of a necessary element in an instruction is harmless if it is "clear beyond a

reasonable doubt that a reasonable jury would have found the defendant guilty absent the

error")?   The Court will address these issues in turn.

        1.      Whether charging the jury with CALJIC 8.51 amounted to federal error

     First, this Court will consider whether charging the jury with CALJIC 8.51 amounted to

federal error.   The fact that an instruction is allegedly incorrect under state law is not, on its own,

a basis for federal habeas relief.   *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).   Rather, to obtain

federal habeas relief on an instructional error, a petitioner must show that the ailing instruction

"so infected the entire trial that the resulting conviction violates due process."   *Id.* (quoting *Cupp*

*v. Naughten*, 414 U.S. 141, 147 (1973)).   "Nonetheless, not every ambiguity, inconsistency, or

deficiency in a jury instruction rises to the level of a due process violation."   *Middleton v.*

*McNeil*, 541 U.S. 433, 437 (2004).   The instruction may not be judged in artificial isolation, but

must be considered in the context of the instructions as a whole and the trial record.   *Estelle*, 502

U.S. at 72.   A conviction based on a general verdict is subject to challenge if the jury was

instructed on alternative theories of guilt and may have relied on an invalid one.   *Hedgpeth*, 555

U.S. at 58 (2008).   Thus, the state law error was also a federal error only if there was a

reasonable likelihood that one or more jurors found Berry guilty of second degree murder on the

assumption that CALJIC 8.51 eliminated the obligation of considering whether Berry understood the risk his conduct presented to Wine and consciously disregarded that risk.

Berry argues that this case is governed by *Suniga*, 998 F.2d 664, and if this Court were to agree, he would prevail. Respondent, however, argues that *Townsend v. Knowles*, 562 F.3d 1200 (9th Cir. 2011), *cert. denied*, 558 U.S. 871 (2009), *abrogated on other grounds by Walker v. Martin*, 131 S. Ct. 1120 (2011), which distinguishes *Suniga*, controls, and if this Court were to agree, Respondent would prevail.

In *Suniga*, the trial court charged the jury with CALJIC 8.10, which defines murder as the unlawful killing of another with malice aforethought, but modified it to include the alternate theory of felony murder:

> The defendant is charged in Count I of the Information with the commission of the crime of murder, a violation of Section 187 of the Penal Code. The crime of murder is the unlawful killing of a human being with malice aforethought or the unlawful killing of a human being which occurs during a commission or attempt to commit a felony inherently dangerous to human life. In order to prove the commission of the crime of murder, each of the following elements must be proved: Number one, that a human being was killed; two, that the killing was unlawful; and three, that the killing was done with malice aforethought or occurred during the commission of or attempt to commit a felony inherently dangerous to human life.

> An assault with deadly weapon is a felony inherently dangerous to human life.

*Suniga*, 998 F.2d at 666.

The trial court also gave CALJIC 8.51, the first line of which Berry also finds objectionable. By charging the jury with the modified version CALJIC 8.10, which stated that a conviction for assault with a deadly weapon could serve as a substitute for a finding of malice, it was inevitable that where the jury found the defendant guilty of assault with a deadly weapon that it would also find him guilty of second degree murder without having to consider whether he

acted with malice.  The Ninth Circuit concluded that the instructions were erroneous because assault with a deadly weapon was assaultive in nature, merged with the murder charge, and could not form the basis of a felony murder instruction or conviction.  *Id*. at 667.  In the Ninth Circuit's view, the erroneous instructions "infected the entire trial," violated due process, and required the defendant's conviction to be set aside.  *Id*. at 669-70.  In the instant case, CALJIC 8.10 was given, but that instruction defined murder solely as requiring a finding of malice aforethought and did not reference felony murder as an alternative.  The trial court also gave CALJIC 8.11, which outlines express malice as well as implied malice, defined as the intentional performance of an act dangerous to human life with knowledge of the risk involved and a conscious disregard for that risk.  Although CALJIC 8.51 was also given, it did not reference any specific felony, although the jury was separately instructed regarding assault with a firearm and corporal injury to a cohabitant, which were identified as felonies in the verdict forms and fleetingly in other instructions.

In *Townsend*, which was decided after *Suniga*, the Ninth Circuit considered a habeas corpus petitioner's complaint that CALJIC 8.51, again, which was given here, permitted the jury to convict him of second degree murder without concluding that he acted with malice.  562 F.3d at 1208.  The Ninth Circuit concluded that the isolated references in CALJIC 8.51 to "felony" and "murder" did not amount to a federal constitutional error because the jury was not charged with the full felony murder instruction given in *Suniga*, the petitioner was not charged with and the jury was not instructed on any felony other than murder and manslaughter, the second degree murder instructions required the jury to find that the petitioner acted with either express or implied malice, and the jury did not acquit the petitioner of murder and find him guilty of the

lesser included charge of manslaughter—a charge that does not require proof of malice aforethought.  *Id*. at 1210.  The Ninth Circuit held that, "[c]onsidering the challenged instruction in the context of all of the instructions provided, . . . its tangential reference to 'felony' and 'murder' did not so infect the trial 'that the resulting conviction violates due process.'"  *Id*. at 1211 (quoting *Estelle*, 502 U.S. at 72).

There are several factors which bring the instant case within *Townsend* rather than *Suniga*.  First, the jury was not given the full felony murder instruction found objectionable in *Suniga*, which, as discussed, was a modification of CALJIC 8.10 that defined murder and provided that the commission of a felony inherently dangerous to human life substitutes for a finding of malice.  Nor did the trial court give CALJIC 8.32, which defines the unlawful killing of another in the commission of crime specified by the court as felony murder.  Rather, the trial court gave CALJIC 8.51, the first line of which mentions the commission of a felony in conjunction with murder, together with its complementary instruction CALJIC 8.50.  CALJIC 8.50 and CALJIC 8.51 do not define murder, but rather differentiate murder from manslaughter and also reiterate that malice is an essential element of murder.[4]  In addition, the trial court

---

[4]      The second paragraph of CALJIC 8.51 states:

> There are many acts which are lawful but nevertheless endanger human life.  If a person causes another's death by doing an act or engaging in conduct in a criminally negligent manner, without realizing the risk involved, he is guilty of involuntary manslaughter.  If, on the other hand, the person realized the risk and acted in total disregard of the danger to life involved, malice is implied, and the crime is murder.

Thus, CALJIC 8.51 is at most ambiguous because although the first line does state that "[i]f a person causes another's death, while committing a felony which is dangerous to human life, the crime is murder," the final line correctly states that "[i]f, on the other hand, the person realized the risk and acted in total disregard of the danger to life involved, malice is implied, and the crime is murder."

redacted any reference to felony murder found in 8.50.  Thus, in contrast to *Suniga*, the trial

court did not at any point expressly instruct the jury that it could find Berry guilty of murder

absent a finding of malice, or expressly state that the commission of a felony served as an

alternate theory of second degree murder.[5]

Second, although it is true that unlike in *Townsend*, the jury here was separately

instructed on CALJIC 9.02, assault with a firearm, and CALJIC 9.35, corporal injury to a

cohabitant, both of which are felonies, those instructions did not identify them as such.  Rather,

they were fleetingly identified as felonies in other instructions and in the applicable verdict

forms.  In any event, at no point did the trial court identify those felonies as predicate felonies for

finding Berry guilty of second degree felony murder.  In *Suniga*, the court not only informed the

jury that a felony dangerous to human life could serve as a substitute for malice, but also that the

felony the defendant was accused of was in fact dangerous to human life.  998 F.2d at 666.

There was no such identification of a predicate felony here.

Third, the trial court repeatedly instructed the jury that in order to find Berry guilty of

murder, it must find that he acted with express or implied malice.  Specifically, the court

instructed the jury that a conviction of murder requires a finding of malice aforethought, that

malice may be express or implied and the elements of each form of malice, that second degree

---

[5]      While an attorney practicing criminal law in California would be aware that the
commission of certain felonies inherently dangerous to human life may obviate the need to find
implied malice in order to return a verdict on second degree murder, *see Sarun Chun*, 203 P.3d at
431 ("the felony-murder rule 'acts as a substitute' for conscious-disregard-for-life malice")
(citation omitted), *People v. Dillon*, 668 P.2d 697, 718 (Cal. 1983) (malice is not an element of
felony murder), this would not be known to lay members of the jury absent an instruction to this
effect.  No such instruction was given.

murder is the unlawful killing of another with malice but without deliberation and premeditation, that second degree implied malice murder is the unlawful killing of another where an act whose natural consequences are dangerous to human life, and the defendant deliberately performed the act with knowledge of the danger to, and a conscious disregard for, human life, that manslaughter is the unlawful killing of another without malice aforethought, and that malice may be negated upon the ground of sudden quarrel or heat of passion.  This Court cannot conclude, as Berry suggests, that the cursory reference to felony murder in CALJIC 8.51, particularly in light of the second paragraph of 8.51 which told the jury that it must find that Berry realized the risk to Wine and acted in total disregard of the danger to her life, was reasonably likely to lead the jury to find Berry guilty of felony murder without finding that he acted with malice.  In order to do so, the jury would have had to single out the sole reference to the commission of a felony dangerous to human life as murder, ignore the plethora of instructions requiring a finding of malice, and presume, without an instruction on the matter, that felony murder and implied malice murder were alternatives.  The jury deliberated for two days.  Although the jury asked questions during deliberations, none of their questions concerned felony murder or whether the jury could return a verdict for second degree murder absent a finding of malice.  In fact, none of their questions concerned how to apply the law to the facts; rather, their questions, which were mostly requests to hear testimony, appeared to be focused on the application of the facts to the law provided.  This further suggests that no member of the jury was troubled by the first line of CALJIC 8.51.[6]

---

[6]      It is true that only one member of the jury need be misled in order for this instruction to be problematic, but there is no evidence that any juror had doubts not shared with the other jurors.  The jurors were not shy about communicating with the court.  If a juror mentioned to the other jurors a belief that the first line in CALJIC 8.51 meant that if the jury

Berry additionally argues that the prosecutor's closing arguments encouraged the jury to return a verdict on the phantom theory of felony murder. In his initial closing argument, the prosecutor argued that Berry was guilty of first degree murder or, at a minimum, second degree implied malice murder. The prosecution made no mention of felony murder. He also argued that Berry's alleged intermittent explosive disorder did not negate the mental state for first degree murder, second degree murder, or voluntary manslaughter because Berry still understood what what he was doing. In response, defense counsel argued that what the State had to prove in order to convict Berry of first or second degree murder was that Berry "was subjectively aware that his conduct endangered [Wine's] life and that he acted in conscious disregard for her safety and for the risk that his conduct exposed her to." Defense counsel later addressed the instructions on voluntary and involuntary manslaughter. Defense counsel conceded that Berry was guilty of "co-habitant battery," but argued that the jury would have to acquit Berry of murder and the lesser-included offense of involuntary manslaughter because pursuant to CALJIC 8.51, "[a] homicide occurs as a result of an unlawful act amounting to a felony," and a "battery is not a felony, and [a conviction of a felony] is the definition of what is required for manslaughter, involuntary manslaughter." Thus, it was defense counsel that introduced the possibility that a conviction of a felony could amount to murder. In rebuttal, the prosecutor addressed defense counsel's argument that the jury should "find [Berry] guilty of [California Penal Code § 273.5], but find him not guilty of everything else." The prosecutor reread CALJIC 8.51, repeating the final line—that where a person realizes the risk of his actions and acts in disregard of the danger

---

found that Berry assaulted Wine with a firearm that it need not determine whether he understood and disregarded the risk of his actions to Wine's life, it is more probable than not that a juror would have asked a question.

to life involved, he is guilty of murder—for a second time.  The prosecutor then commented that

"[w]e're talking about murder here.  This wasn't a misdemeanor battery, as [defense counsel]

tried to say.  This was a felony.  At the very least we have him admitting slapping her.  At the

very least we have him saying he knew he shouldn't be doing that."

When read in context, the prosecutor did not urge the jury to treat a conviction for

corporal injury of a cohabitant or assault with a firearm as a substitute for malice as Berry

suggests.  Rather, the prosecutor correctly stated that a violation of California Penal Code

§ 273.5 was a felony and argued that Berry was guilty of murder not solely because he

committed that felony, but because, in the prosecutor's view, Berry purportedly admitted

recognizing and consciously disregarding the risk of his actions to Wine's life during the

commission of that felony.  The prosecutor reiterated that the jury would need to find malice in

order to convict Berry of murder and argued that Berry had exhibited, at a minimum, implied

malice.  The comments of counsel for both parties did not, as Berry claims, render this a felony

murder trial.  *Cf. Deck v. Jenkins*, ___ F.3d ___, 2014 WL 4800349, at *9-13 (9th Cir. Sept. 29,

2014) (finding "grave doubt" that the prosecutor's closing arguments misstating the law of

attempt were harmless where the misstatements were central to the prosecution's theory of the

case, the trial court did not correct the prosecutor's misstatements, and the evidence concerning

the temporal aspect of the petitioner's intent was not overwhelming).  Moreover, to the extent

that counsels' closing arguments referenced felonies in connection with a murder verdict, the

jury was told that statements made by the attorneys are not evidence, and the jury is presumed to

have followed that instruction absent evidence to the contrary.  *Weeks v. Angelone*, 528 U.S.

225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

Finding *Townsend* controlling, this Court concludes that the first line of CALJIC 8.51 referencing the commission of a felony dangerous to life as murder was an error of state law. However, in viewing the instructions as a whole, as this Court must, *Estelle*, 502 U.S. at 72, that line of the instruction was not reasonably likely to lead the jury to ignore the necessity of considering and finding implied malice in order to find Berry guilty of second degree murder, *see Townsend*, 562 F.3d at 1211; *Lam v. Dickinson*, No. CIV S-10-0829, 2012 WL 1158858, at *12 (E.D. Cal. Apr. 6, 2012) (finding felony murder instruction harmless error because, unlike in *Suniga*, the predicate offense for felony murder was not identified for the jury and the verdict indicated that the jury did not rely on a theory of felony murder); *Williams v. Carey*, No. C 05-3891, 2010 WL 143465, at *4-5 (N.D. Cal. Jan. 5, 2010) (distinguishing *Suniga* and finding no due process violation where the trial court gave the same instruction at issue here but did not give any explicit felony murder instructions, the instructions emphasized the malice requirement, the jury was not instructed on whether any other felonies would qualify as an inherently dangerous felony, and the parties did not reference felony murder in closing argument); *Thomas v. Lamarque*, No. C 02-2981, 2005 WL 679745, at *6-7 (N.D. Cal. Mar. 16, 2005) (distinguishing *Suniga* on the grounds that the trial court did not explicitly instruct on felony murder, the court instructed the jury that second degree murder required a malice finding, the court's instructions repeated that malice aforethought it required for murder, and the trial court did not follow the "solitary and inapplicable statement of law" with an instruction that assault with a deadly weapon is a felony); *Orellana v. Castro*, No. C 00-2466, 2001 WL 590006, at *5 (N.D. Cal. May 23, 2001) (distinguishing *Suniga* on the ground that the trial court did not instruct the jury that various charges were felonies inherently dangerous to human life and the

jury was left to guess what might be a qualifying felony).  Nor was the instruction reasonably

likely to discourage the jury from considering and finding diminished actuality[7], which would

have been irrelevant in a true felony murder case.  The challenged jury instruction therefore did

not so infect the entire trial that Berry's resulting conviction violated due process, *Estelle*, 502

U.S. at 72, and this Court finds no error warranting habeas relief.

        2.       Whether any error was harmless under the Scalia test

Nevertheless, in part because the state appellate court denied relief based upon a

harmlessness determination, this Court will alternatively consider whether, had the error

amounted to a constitutional violation, it would have been harmless under the Scalia test.  This

Court applies *Brecht* de novo and need not defer to the state court's conclusion that the error was

harmless.  *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010); *see also Ayala v. Wong*, 756

F.3d 656, 664-65, 669-70 (9th Cir. 2014) (where the state appellate court either found error in

the petitioner's favor under both state and federal constitutional law or found error under state

law but did not decide whether there was error under federal constitutional law, and in either

---

     [7]     In the early 1980's, the California legislature abolished the defenses of
diminished capacity, diminished responsibility, and irresistible impulse as a matter of public
policy.  *People v. Saille*, 820 P.2d 588, 593 (Cal. 1991).  Since then, evidence of mental illness
or voluntary intoxication is not admissible to negate a defendant's capacity to form any
particular mental state, but is admissible solely with respect to whether the defendant *actually
formed* a required specific intent, premeditated, deliberated, or harbored malice aforethought,
when a specific intent crime is charged.  *Id*.  This Court will follow the state courts in referring
to this concept as "diminished actuality."  Here, the trial court instructed the jury on diminished
actuality by giving CALJIC 3.32 and CALJIC 4.21.1, which state that the jury may consider
mental disease or defect or voluntary intoxication for the purpose of determining whether Berry
actually formed the specific intent or mental state necessary to return a conviction for first
degree murder, second degree murder, or manslaughter.

case clearly did not conclude that there was no federal error, a federal habeas court will not defer to the state court's harmlessness determination).

In *Suniga*, the Ninth Circuit applied a harmless error test similar to that later set forth by Justice Scalia in his concurring opinion in *Roy*, 519 U.S. at 7, and adopted by the California Supreme Court in *Sarun Chun*, 203 P.3d at 446. 998 F.2d at 670. Justice Scalia agreed with the *Roy* majority that the standard of harmlessness set forth in *Brecht*, 507 U.S. at 628 (an error requires reversal only if it had a "substantial and injurious effect or influence in determining the jury's verdict"), should apply to federal habeas review of an erroneous jury instruction, and sought to give content to that standard. 519 U.S. at 6. Justice Scalia cautioned, however, that a harmlessness determination cannot be made solely on the weight of the evidence presented to the jury because "[t]he Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty." *Id*. at 7 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993)). "A jury verdict that he is guilty of the crime means, of course, a verdict that he is guilty of *each necessary element* of the crime." *Id.* Justice Scalia thus concluded that the instructional error at issue in *Roy* could be held harmless on habeas review only if: 1) "the jury verdict on other points effectively embrace[d] [the omitted element of the crime]," or 2) "if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well." *Id*. This Court will thus consider whether, had the instruction amounted to federal error, it was nevertheless harmless under either alternative suggested by Justice Scalia.

Under Justice Scalia's first alternative, the focus of this Court's inquiry, therefore, is whether the verdict on other charges effectively "embraced" a finding of implied malice, which

is the least serious allegation of malice necessary to support a murder conviction.  In deciding

this point this Court looks to the actual verdicts rendered by the jury in light of the jury

instructions addressing the elements necessary to render those verdicts, the arguments of

counsel, and the evidence in the case regarding those verdicts.

Here, the trial court instructed the jury in accordance with California's judicial definition

of second degree implied malice murder as set forth in CALJIC 8.31:

> Murder of the second degree is also the unlawful killing of a human being when:
> 1. The killing resulted from an intentional act,
> 2. The natural consequences of the act are dangerous to human life, and
> 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
> When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.

As already mentioned, Berry was also charged with a violation of California Penal Code

§ 273.5, which proscribes the willful infliction of corporal injury resulting in a traumatic

condition on a cohabitant.  CAL. PENAL CODE § 273.5(a), (b)(2).  A traumatic condition is

defined as "a condition of the body, such as a wound, or external or internal injury, including,

but not limited to, injury as a result of strangulation or suffocation, whether of a minor or serious

nature, caused by physical force."  *Id*. § 273.5(d).  The trial court instructed the jury with

CALJIC 9.35 on this charge as follows:

> Every person who willfully and unlawfully inflicts upon a person who is his former spouse[,] former cohabitant, or the mother of his child, corporal injury resulting in a traumatic condition[,] is guilty of section 273.5 subdivisions (a) of the Penal Code, a crime.
> "Corporal injury" means bodily injury.
> The word "willfully" as used in this instruction means a purpose or willingness to commit the act that results in corporal injury.
> The word "inflicts" as used in this instruction means that the corporal injury results from a direct application of force by the perpetrator upon the victim.

-24-

A "traumatic condition" is a condition of the body such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force.

"Cohabiting" means unrelated persons living together in a substantial relationship—one shown at least by permanence and sexual or amorous intimacy. Holding oneself out to be the husband or wife of the person with whom one is cohabiting is not required.

In order to prove this crime, each of the following elements must be proved:

1. A person inflicted bodily injury upon his former spouse, a former cohabitant, [or] the mother of his child;

2. The infliction of bodily injury was willful and unlawful; and

3. The bodily injury resulted in a traumatic condition.

The use of force or violence is not unlawful when done in lawful self defense or defense of others. The burden is on the People to prove that the use of force or violence was not in lawful self defense or defense of others. If you have a reasonable doubt that the use of force or violence was unlawful, you must find the defendant not guilty.

The jury not only found Berry guilty of corporal injury of a cohabitant, but also found true the special allegations with respect to that count that Berry used a shotgun and inflicted great bodily injury.

Berry was likewise charged with a violation of California Penal Code § 245(a)(2), which punishes "[a]ny person who commits an assault upon the person of another with a firearm." An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." CAL. PENAL CODE § 240. Once a defendant has attained "the means and location to strike immediately," he has the "present ability" to injure. *People v. Chance*, 189 P.3d 971, 973 (Cal. 2008) (citation omitted). Assault is a general intent crime which "does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur." *People v. Williams*, 29 P.3d 197, 204 (Cal. 2001). "[A] defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did

not know but should have known.  He, however, need not be subjectively aware of the risk that a

battery might occur." *Id*. at 203.

The court instructed the jury in accordance with these principles as follows:

> Every person who commits an assault upon another person is guilty of a violation
> of Penal Code section 240, a misdemeanor crime.
> In order to prove an assault, each of the following elements must be proved:
> 1. A person willfully [and unlawfully] committed an act which by its nature
> would probably and directly result in the application of physical force on another person;
> 2. The person committing the act was aware of facts that would lead a reasonable
> person to realize that as a direct, natural and probable result of this act that physical force
> would be applied to another person; and
> 3. At the time the act was committed, the person committing the act had the
> present ability to apply physical force to the person of another.
> The word "willfully" means that the person committing the act did so
> intentionally.  However, an assault does not require an intent to cause injury to another
> person, or an actual awareness of the risk that injury might occur to another person.
> To constitute an assault, it is not necessary that any actual injury be inflicted.
> However, if an injury is inflicted it may be considered in connection with other evidence
> in determining whether an assault was committed [and, if so, the nature of the assault.]
> A willful application of physical force upon the person of another is not unlawful
> when done in lawful self-defense or defense of others.  The People have the burden to
> prove that the application of physical force was not in lawful self-defense [or] defense of
> others.  If you have a reasonable doubt that the application of force was unlawful, you
> must find the defendant not guilty.
>
> . . . .
>
> A necessary element of assault is that the person committing the assault have the
> present ability to apply physical force to the person of another.  This means that at the
> time of the act which by its nature would probably and directly result in the application of
> physical force upon the person of another, the perpetrator of the act must have the
> physical means to accomplish that result.  If there is this present ability, "present ability"
> exists even if there is no injury.
>
> . . . .
>
> Every person who commits an assault upon the person of another with a firearm is
> guilty of a violation of section 245, subdivision (a)(2) of the Penal Code, a crime.
> A firearm includes any device designed to be used as a weapon from which a
> projectile may be expelled by the force of an explosion or other form of combustion.
> In order to prove this crime, each of the following elements must be proved:

        1. A person was assaulted; and

        2. The assault was committed [with] a firearm.

The jury convicted Berry on this count and also found true the special allegations that he personally used a shotgun in the assault and personally inflicted great bodily injury.[8]

Section 273.5(a) uses no other language of intent other than the word "willfully," specifying only that the completed act *result* in a "traumatic condition."  Similarly, the instructions on assault with a firearm also charged the jury that an element of the crime of assault is that the perpetrator "willfully" committed an act which by its nature would probably and directly result in the application of physical force on another person.  "'[W]illfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to.  It does not require any intent to violate the law, or to injure another, or to acquire any advantage."  CAL. PENAL CODE § 7(1).  Corporal injury of a cohabitant and assault with a firearm are thus general intent crimes in California.  *People v. Williams*, 29 P.3d 197, 203 (Cal. 2001)*; People v. Thurston*, 84 Cal. Rptr. 2d 221, 225 (Cal. Ct. App. 1999).  Corporal injury of a cohabitant requires "only the mens era of intending to do the assaultive act," *Thurston*, 84 Cal. Rptr. 2d at 225, and assault with a firearm similarly only requires the "aware[ness] of the facts that would lead a reasonable person to

---

      [8]      It was never contended that Berry shot Wine with the shotgun.  While not clear from CALJIC 9.02, the instruction on assault with a firearm, CALJIC 17.19, the instruction on the enhancement for personal use of a firearm, makes it clear that "personal use of a firearm" includes intentionally striking someone with a firearm.  Here, the theory of the case was that Berry struck Wine with the shotgun, which may have been inoperable.  While Wine had bruises all over her body, the undisputed medical evidence was that multiple blows to Wine's head with a blunt instrument caused her death.  The jury found that Berry caused her death and beat her with the shotgun.

realize that a battery would directly, naturally, and probably result from his conduct," *Williams*, 29 P.3d at 203.

In order to convict Berry of the corporal injury of Wine, the jury had to have found that Berry harbored the intent to do the assaultive act, and to convict him of assault with a firearm, it likewise had to find that he intended to do an act which would likely result in a battery. Although the jury additionally found that both were committed with the use of a firearm and resulted in great bodily injury, these additional findings are enhancements relating to the circumstances of the crime and do not require any consideration of Berry's mental state. The guilty verdicts on these two crimes, plus the jury's conclusion that Berry's actions caused Wine's death, arguably embraced the first two findings necessary to convict Berry of second degree implied malice murder, namely, that: 1) the killing resulted from an intentional act, and 2) the natural and probable consequences of that act—beating Wine with a shotgun—were dangerous to human life. However, there is no basis for concluding that in finding Berry guilty of corporal injury of Wine and assault with a firearm and their related enhancements that the jury had to specifically consider the third aspect of implied malice murder, Berry's subjective assessment of the risk of his actions, otherwise referred to as having knowledge of the danger to,

and a conscious disregard for, human life.[9]  Thus, if the instruction error amounted to federal

error, it would not be harmless under the first alternative of the Scalia test.

      Concluding that the jury verdicts on corporal injury of a cohabitant and assault with a

firearm did not embrace a finding of Berry's subjective awareness of the risks associated with

his actions, this Court must next consider whether the isolated reference to the commission of a

felony dangerous to human life as murder in CALJIC 8.51, if it amounted to federal error, had a

substantial and injurious effect on the jury's verdict under the second part of the Scalia test—i.e.,

whether "it is impossible, upon the evidence, to have found what the verdict *did* find without

finding this point as well."  *Roy*, 519 U.S. at 7.

      To recap, the medical evidence was undisputed that while Wine had bruises all over her

body, her death was caused by repeated blows to the top of her head with a blunt instrument.

The jury found that Berry killed Wine and used a firearm as a club, thus implicitly finding that

he had struck her repeatedly on the top of her head.

      When the Court considers the manner of Wine's death, together with the evidence

supporting the jury's verdicts of assault with a firearm and inflicting corporal injury on a

cohabitant, it appears that the jury could not have returned the verdicts it did without concluding

---

    [9]     As already discussed, the jury was fully instructed on diminished actuality based upon alcohol or drug consumption or mental illness as relevant to second degree murder.  The gist of these instructions was that if Berry, by virtue of mental illness, alcohol, drugs, or a combination thereof, actually failed to form the mental state of knowledge of the risk his actions bore to Wine and a conscious disregard of those risks, second degree murder would be reduced to manslaughter.  The jury was also instructed that heat of passion could reduce murder to manslaughter, as could being unconscious from the use of alcohol or drugs.  The jury convicted Berry of second degree murder—not manslaughter—which supports an inference that the jury considered and rejected diminished actuality.  No instruction told the jury that if they found that Wine's death occurred during a felony by Berry they could disregard diminished actuality.

that Berry must have known of the risks to Wine and consciously disregarded them.  Berry

ripped Wine's hair out in such a manner as to render her unconscious.  But instead of getting

help for Wine, who Berry observed was unresponsive, the jury had to reject Berry's denials and

find that he viciously beat her.  In finding that he used a firearm during the assault and corporal

injury of Wine, the jury rejected Berry's claim that he merely slapped Wine and credited Allen's

police interview that he saw Berry hit Wine in the head with the shotgun as well as the medical

testimony that Wine died of multiple blunt force injuries to her head from different directions.  It

was impossible on this evidence—the nature of the beating and the fact that some, if not all of

the beating, occurred after Berry was aware that Wine was unconscious—that the jury did not

find that Berry acted with implied malice in finding him guilty of corporal injury with a firearm

causing great bodily injury and assault with a firearm causing great bodily injury.[10]  *Roy*, 519

U.S. at 7; *see Shackleford v. Hubbard*, 234 F.3d 1072, 1078-79 (9th Cir. 2000) (erroneous felony

murder instruction was harmless because the jury had to have found express malice in finding

the petitioner guilty of first degree murder by torture); *see also Leon v. Felker*, 506 F. App'x

573, 575 (9th Cir. 2013) (erroneous felony murder instruction was harmless error where the

---

[10]     Substantial evidence also supports the conclusion that the jury found implied malice.  For example, Berry testified that he went into a rage and trashed the room after Wine lost consciousness, indicating that at that point he was acting recklessly.  After beating Wine, who had a preexisting traumatic brain injury, Berry, instead of getting help, went to a bar, then returned home to possibly beat her some more.  According to Allen, although Wine's face was badly bruised and she was not breathing, Berry did not want him to get help and in fact threatened to kill everybody if Allen did seek help.  When the police arrived, Berry admitted that the situation was "bad," and placed his hands behind his back without being prompted to do so, evidencing that Berry was aware that he had put Wine's life in danger.  However, under the second part of the Scalia test, this evidence may not be considered by the Court because the question is not what a reasonable jury would have found under the circumstances or what verdict the record evidence might have supported, but whether "it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well."  *Roy*, 519 U.S. at 7.

petitioner admitted to intentionally firing his handgun at close range into an occupied vehicle evidencing implied malice). Applying the second part of Justice Scalia's test as set forth in *Roy*, this Court cannot conclude that, if there was an error of constitutional dimension, that it had a substantial or injurious effect on the jury's verdict.

        3.      Whether any alleged error would be harmless under *Neder*

Subsequent to *Roy*, however, the United States Supreme Court decided *Neder v. United States*, in which the majority specifically considered and rejected, over vigorous dissents, a test for harmlessness similar to that set forth by Justice Scalia in *Roy* and the Ninth Circuit in *Suniga*. 527 U.S. at 12-13. *Neder* involved a tax prosecution in federal court which resulted in a conviction which was directly appealed to the Eleventh Circuit. *Id*. at 6. The Supreme Court granted certiorari to consider whether the District Court's instruction that the jury need not consider the materiality of any false statement amounted to harmless error and whether materiality was an element of the federal mail fraud, wire fraud, and bank fraud statutes. *Id*. at 7. The Supreme Court found that materiality was in fact an element of each of the fraud counts but that the error in removing this issue from the jury was not "structural" in nature and was therefore subject to harmless error analysis under *Chapman v. California*, 386 U.S. 18, 24 (1967) (on direct appeal, a constitutional error may only be excused if it is harmless beyond reasonable doubt). *Id*. at 8, 15. Neder contended that an instruction which erroneously omitted an element of the offense could only be found harmless "upon a determination that the jury rested its verdict on evidence that its instructions allowed it to consider," because "[t]o rely on overwhelming record evidence of guilty the jury did not *actually* consider . . . would be to dispense with trial by jury and allow judges to direct a guilty verdict on an element of the offense." *Id*. at 17. This is

essentially the view expressed by Justice Scalia in his concurring opinion in *Roy*.  The majority,

however, rejected the contention that the other jury findings necessarily had to embrace the

omitted element, instead concluding that "where a reviewing court concludes beyond a

reasonable doubt that the omitted element was uncontested and supported by overwhelming

evidence, such that the jury verdict would have been the same absent the error, the erroneous

instruction is properly found to be harmless."  *Id*.  In other words, where an element is omitted

from an instruction but not otherwise litigated, the operative question is: "Is it clear beyond a

reasonable doubt that a rational jury would have found the defendant guilty absent the error?"

*Id*. at 18.

> If *Neder* only deviates from Scalia's interpretation of harmless error where a necessary

element was omitted from jury consideration if the element is uncontested and the evidence

overwhelming, then *Neder* would not change the result in this case.  The record evidence of

implied malice was indeed overwhelming—again, Berry brutally and repeatedly beat Wine, who

had a preexisting traumatic brain injury, in the head with a shotgun after realizing she was

unconscious, and instead of getting help, he went to a bar and discouraged Allen from seeking

help.  But unlike the issue of materiality in *Neder*, Berry's mental state was hotly contested.

Berry testified that he thought Wine was originally faking unconsciousness, and stated that

although he repeatedly slapped her, he did so only in an attempt to revive her.  Although the jury

had to discredit some of Berry's testimony in order to find him guilty of second degree murder,

assault with a firearm, and corporal injury with a firearm, this Court cannot conclude that

implied malice was not controverted.  In addition, the jury was thoroughly instructed on

diminished actuality due to voluntary intoxication, drug use and mental illness.  The jury was

also told that diminished actuality was relevant to second degree murder and could reduce murder to manslaughter. Given a limited reading, *Neder* would not permit a finding of harmless error on this record. It is possible that *Neder* would permit a finding of harmless error even where the omitted element was contested if the evidence was overwhelming, but given the sharp division between the justices in *Neder* and Justice Scalia's concerns about taking issues from the jury, this Court will not extend *Neder* to the facts of this case.

In sum, this Court follows *Townsend* and concludes that the first sentence in CALJIC 8.51, which states that "[i]f a person causes another's death, while committing a felony which is dangerous to human life, the crime is murder," when considered in connection with all of the instructions given, was not reasonably likely to mislead any juror to ignore the numerous instructions, including the second paragraph of CALJIC 8.51, requiring it to consider malice aforethought and diminished actuality before returning a verdict of murder in either degree. The state error in giving the instruction therefore did not rise to the level of a federal constitutional error. Alternatively, the Court is persuaded that, given what the jury did find, it would have been impossible for it nevertheless to conclude that Berry did not understand the risk from repeatedly beating Wine on the head with his shotgun and, because he continued after he knew she was disabled, he consciously ignored the risk. Thus, if the instructional error did amount to an error of constitutional dimension, it was nevertheless harmless.

Berry additionally argues that his trial counsel was ineffective for failing to object to the instruction. As already discussed, viewing the instructions as a whole, they did not discourage or preclude the jury from considering whether Berry appreciated the risk to Wine of beating her on the head with the shotgun and reaching a finding of implied malice, and the jury's findings on

corporal injury of a cohabitant and assault with a firearm indicate that it found that Berry acted

with implied malice.  As such, Berry cannot establish that there is a reasonable probability that,

but for counsel's error in failing to object to the first line of CALJIC 8.51, the result of his trial

would have been different even assuming that a timely objection would have lead the trial court

to modify CALJIC 8.51 or omit it entirely.  *See Lockhart,* 474 U.S. at 57.

Claim two: Mutual combat instruction

Berry next argues that the trial court erred in instructing the jury on mutual combat,

which allegedly prevented the jury "from properly considering his claims of self-defense and

shifted the burden of proof on those claims away from the prosecution."  According to Berry, the

mutual combat instruction "requires a much more significant showing of self-defense and is only

applicable in cases of a gun duel, or other form of pre-arranged mutual combat."  He claims that

"[t]he jury, being instructed that Mr. Berry was a participant in mutual combat, thus was directed

to hold Mr. Berry to virtually the same standard as if he had been the initial aggressor . . .

[which] effectively limited his right to self-defense."[11]

The Court of Appeal rejected this claim as follows:

> The mutual combat instruction informed the jury that [Berry] had no right of self
> defense unless he: (1) tried to refuse to continue fighting, (2) made the victim aware he
> wanted to stop fighting, (3) made the victim aware he had stopped fighting, and (4) gave
> the victim the opportunity to stop fighting.  However, the mutual combat instruction is

---

[11]     The trial court recognized that under the evidence there were three possibilities:
1) that Wine was the initial aggressor, *see* CALJIC 5.17 (imperfect self-defense) and CALJIC
5.30 (self-defense against assault); 2) that Berry was the initial aggressor, *see* CALJIC 5.54 (self-
defense by an aggressor); or 3) that Wine and Berry fought but neither qualified as an initial
aggressor, *see* CALJIC 5.56 (mutual combat).  There was substantial evidence that Wine and
Berry both battered each other.  However, the phrase "mutual combat" is a term of art under
California law limited to jousts between knights, street gang rumbles and duels between
gentlemen, rather than spontaneous fights between others.  For reasons set out in this decision,
this conceded error of state law did not rise to the level of a federal deprivation of due process.

inapplicable unless there is evidence that "a reciprocal exchange of blows [was] *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities.*" (*People v. Ross* (2007) 155 Cal. App. 4th 1033, 1045.)  There was no evidence in this case that the parties agreed to fight prior to the initiation of hostilities.

Even though [Berry] did not object to the instruction at trial, we may review the instruction if it affected [his] substantial rights.  (*People v. Flood* (1998) 18 Cal. 4th 470, 482, fn. 7.)  The instruction affected [Berry's] substantial rights if it resulted in a miscarriage of justice making it reasonably probable he would have obtained a more favorable result absent the error.  (*People v. Andersen* (1994) 26 Cal. App. 4th 1241, 1249.)  "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim-at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*Ibid.*)

[Berry] argues the harm in giving the mutual combat instruction was that it left "little leeway for a claim of self-defense or imperfect self-defense."  We conclude it was not reasonably probable that [Berry] would have obtained a more favorable result absent the error because the excessiveness of the force and [Berry's] use of force beyond the point any danger continued to exist, destroyed any excuse, making the defenses unavailable to him.

The right to use force in self defense continues only as long as the danger reasonably appears to exist.  The right to use force ends when the attacker no longer appears capable of inflicting injury.  (*People v. Parrish* (1985) 170 Cal. App. 3d 336, 352; *People v. Martin* (1980) 101 Cal. App. 3d 1000, 1010.)  Similarly, the use of excessive force destroys the justification of self defense.  (*People v. Hardin* (2000) 85 Cal. App. 4th 625, 629-630.)

[Berry] never indicated he feared for his life when Wine confronted him.  Instead, he testified Wine set him off, that he lost his temper, and lost control.  By [Berry's] own admission, the infliction of the lethal blows to Wine's head occurred after she stopped fighting and he gained control of her.  In fact, the only blows he admits to administering were the slaps to her face, which occurred after she was unconscious and no longer capable of injuring him.  Moreover, the force he used to kill her by beating her in the head was excessive compared to her attempts to scratch and claw him.  Even if Wine had scissors, as [Berry] claimed, he disarmed her almost immediately, and only after he disarmed her did he deliver the fatal blows.

Thus, the evidence showed neither self defense nor imperfect self defense.  Accordingly any error in giving the mutual combat instruction, and thereby depriving defendant of these defenses, did not result in a miscarriage of justice.

*Berry*, 2009 WL 3247371, at *3-4.

The instruction Berry complains of was preceded by a panoply of instructions on self-

defense, including a basic instruction on self-defense, as well as instruction on imperfect self-

defense, the concept of proportionality as it relates to self-defense, that the jury may consider that Wine allegedly threatened or assaulted Berry in the past in assessing whether he actually and reasonably believed his safety was endangered, that actual danger is not necessary to justify self-defense, that the right to self-defense only exists as long as the real or apparent danger continues to exist and ends when there is no longer any apparent danger of further violence on the part of the assailant, and the circumstances under which the right to self-defense is afforded to a person who initiated an assault.  Both parties referred to this case as a fight—the prosecutor claimed that Berry initiated the fight by baiting Wine, and defense counsel claimed that Wine was the initial assailant.  Under these circumstances, the jury had to be instructed on the basic parameters and limitations as to each party's claim that the other initiated the fight.

There was evidence that Wine and Berry had engaged in physical fights in the past. "Mutual combat," however, is a term of art in California which refers to a preexisting intent to engage in combat, such as in a duel.  *See People v. Ross*, 66 Cal. Rptr. 3d 438, 447 (Cal. Ct. App. 2007).  As there was no evidence of a preexisting intent to engage in combat, it was an error of state law to give the mutual combat instruction.  However, this Court is convinced that this state error did not rise to the level of a federal constitutional error.  Berry notes that CALJIC 5.56 provides limitations on self-defense where the jury finds mutual combat, but those limitations are identical to the limitations imposed on the initial aggressor as set forth in CALJIC 5.54, which Berry does not find objectionable.  In any event, the limitations seem to be cumulative of the many instructions given which in various ways convey the idea that self-defense only permits the use of force that appears necessary to avoid force by the other party.  This instruction did not so infect the entire trial as to deny Berry due process under federal law.

-36-

Alternatively, the Court of Appeal found that any error did not result in a miscarriage of justice because there was no evidence whatsoever that Berry acted in self-defense. Such a conclusion is a matter of state law entitled to this Court's deference. *Menendez v. Terhune*, 422 F.3d 1012, 1028-29 (9th Cir. 2005) ("Under California law, a defendant is entitled to a jury instruction only if substantial evidence, or evidence sufficient to deserve consideration by the jury, supports the giving of that instruction," and a state court's finding that the evidence does not support a claim of self-defense is entitled to a presumption of correctness and ordinarily should not be disturbed on habeas review (citation omitted)). Accordingly, this Court finds no federal error entitling Berry to habeas relief.[12]

However, even if the Court were to review this claim de novo instead of deferring to the Court of Appeal's conclusion, the Court would agree that Berry's testimony divested him of any claim to self-defense. Berry inflicted the fatal blows after easily disarming Wine and after she ceased doing anything. She was no longer any threat to him, and he admitted that he continued in his course of conduct merely because he had lost control of himself. His claims that he merely slapped Berry in an attempt to revive her, or that her injuries were old injuries from previous falls, were not born out by the medical testimony. Wine was brutally beaten only after she ceased being any threat to Berry. Neither self-defense nor imperfect self-defense were thus available to him under California law, and Berry has failed to establish that the inclusion of the

---

[12]      Whether there is sufficient evidence to warrant a jury instruction is in the first instance directed to the trial judge. In this case, the trial judge gave numerous instructions on perfect and imperfect self-defense. The language from the Court of Appeal, quoted in the text of this decision, indicates that with a fuller opportunity to consider the record, the Court of Appeal implicitly disagreed with the trial court and concluded at least with regard to the force involved in beating Wine on the top of her head with a shotgun causing her death, Berry's own testimony shows he was not entitled to any instruction on self-defense.

mutual combat instruction "violated some right which was guaranteed to [him] by the Fourteenth

Amendment." *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974) (citation omitted).

Moreover, the trial court specifically instructed the jury to disregard any instructions it found

inapplicable, and the jury is presumed to have followed that instruction. *Weeks*, 528 U.S. at 234;

*Richardson*, 481 U.S. at 206.  Berry is not entitled to relief on this ground.

　　Berry additionally argues that counsel was ineffective for failing to object to this

instruction.  However, there is no reasonably likelihood that, had counsel been successful in

excluding the mutual combat instruction, the result of the trial would have been different.  The

mutual combat instruction limits the use of self-defense to a defendant who, in good faith,

refused to continue fighting, caused his opponent to be aware that he has stopped fighting, and

gave his opponent the opportunity to stop.  As already discussed, however, Berry claimed he

assaulted Wine only after he easily disarmed her and she had ceased doing anything.  Mutual

combat, to the extent the jury understood it in lay terms and not as a legal term of art which had

not been explained to them, no longer existed after Berry's testimony made it clear that he was

not entitled to self-defense under the other jury instructions, and the jury would not have applied

the limitations set forth in that instruction differently than they were directed to apply the other

limitations on self-defense by the other instructions.  Accordingly, Berry cannot establish that his

counsel's failure to object to that instruction prejudiced his defense.  *See Strickland*, 466 U.S. at

697 (courts may consider either prong of the  ineffective assistance of counsel test first and need

not address both prongs if the defendant fails on one).

Claim three: Freestanding ineffective assistance of counsel claims

       1.     Failure to exclude evidence of prior instances of domestic violence

Prior to trial, defense counsel filed a motion in limine seeking to exclude any evidence of prior uncharged offenses by Berry.  Defense counsel also filed a motion seeking to introduce good character evidence of Berry and to admit aggressive and violent character evidence of Wine.  The trial court conducted an in limine hearing on November 13, 2007.  The court took notice of counsel's motions to use character evidence and reserved ruling on defense counsel's motions to exclude evidence of uncharged prior bad acts and use character evidence.  Just prior to trial, the court ruled that the People would be permitted to introduce evidence of Berry's prior uncharged bad acts against his first wife, Sandra Berry, his daughter, Angela Berry, and his second wife, Linda Berry, on the ground that his treatment of those three women was highly relevant as to intent.  The court continued:

> The probative value of the prior uncharged testimony is further strengthened by the consistency and the manner in which Mr. Berry treated the three women in his life when these women failed to do what Mr. Berry wanted or did something he did not want them to do, he resorted to.  This evidence has a strong tendency to demonstrate Mr. Berry's intent to exert the same control over the victims by the same conduct.  The court noted that the record shows that the prior acts indicating . . . clumps of hair found in the house, pulling hair, pushing, evidence of hair pulling, although—with respect to the timing, although the incidents occurred over a period of many years, the court is struck by the consistent pattern of conduct that began many years ago and continues in an almost unbroken chain of conduct up to the time of the current offense.
> The prejudicial impact of each defense [sic] is limited.  The probative value is increased by the probative number of women in his life who were subject to his controlling conduct, the repeated conduct with these women, and the repeated manner in which he acts with these women.

At trial, Sandra Berry testified that her marriage to Berry "was a real up and down thing," and that their fights involved physical violence.  She testified that in 1984, she and Berry fought

and he shoved her, pushed her, pulled her hair, and caused bruises on her arms.  On another

occasion, Berry smacked her and she went to the hospital, thinking that she had a concussion.

Angela Berry, the daughter of Sandra and Donald Berry, testified that on one occasion,

she had an argument with Berry and he "poked [her] in the face" and "led [her] by [her] hair" to

a room where he shoved her onto a mattress and hit the top of her head with a open hand.  She

recalled that Berry had slapped her and grabbed her throat in the past.  She recalled another

occasion when Berry was fighting with his second wife, Linda, and he followed Linda and

Angela around with a gun to intimidate them.

William Cote testified that he and Wine had a daughter together named Melody.  Melody

told him that Wine and Berry were using drugs and alcohol and that they had guns in the house.

Cote stated that he would only allow Melody to visit her mother if Wine was actually in the

house.  On one occasion, Melody went to visit Wine, and when Cote called to see if Melody had

arrived safely, Melody informed him that Wine was not at home or even in town.  Cote told

Melody to go to her grandmother's house which was nearby, and that he would pick her up from

there.  Ten minutes later, Berry called Cote and swore at him.  Cote hung up, but Berry called

back and threatened him.  Cote hung up again.  Berry called back again and left a threatening

voice mail message.  The message was played for the jury.  From then on, Cote allowed Wine

and Melody to visit at Melody's grandmother's house, but would not bring her by the house

Wine and Berry shared together.

Melody testified that her family got a restraining order against Berry while Wine was in

the hospital recovering from the car accident because Berry had made threats against them.

According to Melody, after Wine left her father and moved in with Berry, Wine developed

"really bad habits, and she started . . . going downhill." Wine and Berry drank alcohol "[a]ll the time" and did drugs. Wine's personality changed. She "would get mad easy," and was rude and mean. Berry and Wine would argue in their bedroom, and Melody could hear "stuff thrown and slamming, and screaming and yelling."

Berry now argues that his "[t]rial counsel failed to exclude evidence of prior instances of domestic violence, even though the evidence was clearly inadmissible under the California Evidence Code." Berry claims that Sandra Berry's testimony about the 1984 altercation was too remote under California Evidence Code § 1109(e), which provides that prior instances of domestic violence may be introduced against a defendant charged with an offense involving domestic violence, but that evidence of acts occurring more than 10 years before the charged offense is inadmissible unless the court determines that its admission is "in the interest of justice." Berry further contends that the testimony of Angela Berry was "too remote and dissimilar" as well as "undoubtedly prejudicial," and that William Cote's testimony that Melody had informed him about Wine and Berry's use of drugs and alcohol was hearsay. Finally, Berry claims that trial counsel failed to exclude Melody's testimony that Berry used drugs and alcohol and went shooting with her, as well as the recorded message of Berry threatening Cote.

Berry's contentions are without merit. Defense counsel did move prior to trial to have prior bad acts by Berry excluded. Although counsel did not explicitly object either in the motion in limine or at the hearing on the matter on the ground that Sandra and Angela Berry's testimony was too remote under California Evidence Code § 1109(e), counsel's failure to do so was not prejudicial. In granting the People's motion to introduce that evidence, the court ruled that under California Evidence Code sections 1101(b) and 1109, "although the incidents occurred over a

-41-

period of many years," the incidents were highly relevant to intent, and their probative value outweighed their limited prejudicial impact.  In California, the "interest of justice" exception set forth in § 1109(e) "is met where the trial court engages in a balancing of factors for and against admission under [California Evidence Code] section 352 and concludes, as the trial court did here, that the evidence was 'more probative than prejudicial.'"  *People v. Johnson*, 110 Cal. Rptr. 3d 515, 530 (Cal. Ct. App. 2010).  The court thus implicitly ruled that the testimony was admissible in the "interest of justice" despite their remoteness, and any further objection by counsel on that ground would have been futile.  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance"); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (failure to make a futile motion does not constitute the ineffective assistance of counsel).

In any event, Berry cannot show that counsel's failure to object would have led to a different outcome.  *Lockhart*, 474 U.S. at 57.  Evidence of Berry's prior violent episodes with the three women, as well as the testimony of William Cote and the recording of the threatening phone call made by Berry to him, would have been admissible in the prosecution's rebuttal in any event.  Berry sought to introduce evidence as to Berry's good character and Wine's propensity for violence.  California Evidence Code Section 1102 provides that where a criminal defendant offers evidence of his good character, the prosecution may introduce evidence of the defendant's character in rebuttal.  Cal. Evid. Code §§ 1102(a), (b) § 1103(a)(1), (2).  Also, under California Evidence Code § 1103, where a defendant introduces evidence that the victim has a violent character, the prosecution may introduce evidence that the defendant has a tendency for violence.  Cal. Evid. Code § 1103(b).  Berry opened the door to such testimony by

introducing character evidence in his defense, and thus cannot demonstrate that counsel's failure to object on the grounds he suggests prejudiced him.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one); *Lockhart*, 474 U.S. at 57.  The California Supreme Court's denial of habeas relief on this claim was thus not contrary to, or an unreasonable application of, federal law, and Berry is not entitled to federal habeas relief.[13]

> 2.      Calling Berry's brother to testify

Berry called his brother, David Colbeigh, to testify on his behalf.  Colbeigh testified that Berry assisted Wine after the car accident by helping her maintain her balance while walking as well as helping with cooking, cleaning, and doing laundry.  When he had to leave the house, he made arrangements for someone to stay with Wine so she would not be alone.  Colbeigh testified that Berry never limited Wine's access to her family or to the telephones in the house.  Colbeigh claimed that he was present during Adult Protective Service's third and final visit to the home and testified that "they found nothing wrong."  Colbeigh testified that he had witnessed Wine hit and elbow Berry as well as threaten Berry with the shotgun.  Wine would get mad and rip the telephone out of the wall and throw objects such as plates, cups and ashtrays.  According to Colbeigh, Berry would raise his voice to Wine, but he never got physical with her.

---

[13]      In this case, the *Strickland* inquiry is limited to a determination of whether further efforts by counsel would have led the California courts applying California law to exclude the evidence.  There is no federal impediment to the admission of the evidence Berry is complaining about.  The admission of evidence in violation of state evidentiary rules generally does not present a federal question.  *Estelle*, 502 U.S. at 67-88.  There is no governing decision of the United States Supreme Court holding that admission of similar evidence creates a federal question.  *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (Supreme Court has not made it clear that admission of irrelevant or overtly prejudicial evidence violates due process).

Defense counsel asked Colbeigh to explain in what capacity he knew counsel prior to Berry's trial.  Colbeigh explained that defense counsel had represented him in a case in which he was accused of sexual misconduct, and that they were currently preparing for trial.  On cross-examination, Colbeigh, who was in his early forties, testified that he had been accused of having sex with a minor.  He claimed that the young woman he was involved with was almost eighteen, denied that he had sex with her, and stated that he was hoping to marry her.

Berry argues that his trial counsel was ineffective for failing to move to exclude evidence of Colbeigh's pending trial and for eliciting testimony about the charges against him on direct. He claims that "[a]ny minute probative value that existed in the evidence was vastly outweighed by the prejudicial effect that a sex with a minor offense has on a jury."

Respondent concedes that "[a] fairminded jurist could agree that it was a close call whether the trial court would have excluded reference to Colbeigh's pending charges," but argues that it was a reasonable tactical decision for defense counsel to elicit unfavorable testimony on direct because it was anticipated that the prosecution would ask such questions and defense counsel's tactic "avoids allowing the jury to think that the defense is trying to hide something."  *See Smith v. Spisak*, 558 U.S. 139, 161 (2010) (Stevens, J., concurring) (finding counsel's closing argument a reasonable tactical decision under the circumstances of the case because it took the "sting" out of the prosecution's argument and attempted to gain credibility with the jury).  Regardless of whether counsel was deficient in this regard, Berry cannot demonstrate that there was a reasonable probability of a different outcome absent counsel's alleged error.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).  First, Colbeigh denied on cross-

examination that he had ever had sex with the young woman in question, denied that he had a sexual attraction to underage girls, and maintained that he was planning on marrying her. Second, the evidence against Berry was overwhelming.  As already discussed, Berry bludgeoned Wine to death after he had easily disarmed her, she had relinquished doing anything, and he had simply lost control of himself.  It is not reasonably likely that exclusion of Colbeigh's admission that he had a pending charge, which he adamantly denied committing, would have led to an acquittal in Berry's case.  *See Lockhart*, 474 U.S. at 57.  The California Supreme Court's denial of this claim was thus not contrary to, or an unreasonable application of, federal law, and Berry is not entitled to federal habeas relief on this claim.

        3.      Failure to object to the defense investigator's testimony as privileged

In Berry's first interview with the police, he claimed Wine tried to stab him with a pair of scissors.  He did not mention the scissors in his two subsequent interviews with the police. Berry testified at trial that Wine attacked him with a pair of scissors, but admitted on cross-examination that he never told Dr. McGee-Williams, who was retained by defense counsel to perform a psychological evaluation of Berry, about the scissors.

The prosecutor called Julie LaHorgue, the defense investigator, to testify.  LaHorgue testified that she spoke with Berry on several occasions.  In response to the prosecutor's questions, La Horgue stated that in her February 2, 2007, interview with Berry, he did not say anything about Wine attacking him with scissors.

On cross-examination, defense counsel asked whether Berry had told LaHorgue about the scissors in any other interview, to which LaHorgue replied, "Yes, he did."  The prosecutor said, "I'm going to object at this point.  I have not been provided with any other interview for Ms.

LaHorgue other than this one.  If there are going to be questions, I need to get a copy of that interview."  The court sustained the objection, and defense counsel did not pursue the matter. The court did not instruct the jury to disregard LaHorgue's mention of scissors during prior interviews.

Berry argues that his trial counsel acted unreasonably by failing to move to exclude LaHorgue's testimony on the ground that it was protected by attorney-client privilege. Respondent concedes that confidential communications made to a defense investigator acting as an agent of defense counsel are covered by the attorney-client privilege, but claims that the privilege was waived by Berry when Dr. McGee-Williams relied on three of LaHorgue's interviews with Berry.  Regardless of whether under state law Berry waived his attorney-client privilege with respect to the investigator's reports, he cannot demonstrate that his counsel's failure to object on those grounds prejudiced him.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).  First, the jury was aware, because of LaHorgue's answer on cross-examination, that Berry mentioned to her in another interview that Wine came at him with scissors.  Second, this did not negate the fact that Berry recounted the circumstances of the incident to others several times, but failed to mention the scissors.  The prosecutor's point, that Berry would have consistently mentioned the scissors had Wine in fact come at Berry with them, was not affected by the admission of LaHorge's testimony.  Finally, as already discussed, because Berry by his own admission disarmed Wine almost immediately and only delivered the fatal blows after he had thrown the scissors out of her reach and she had relinquished doing anything, self-defense and imperfect self-defense were unavailable to him.  Therefore, there is no reasonable possibility

that, had trial counsel attempted to exclude LaHorgue's testimony that Berry failed to mention

the scissors in one of the interviews, the outcome of his case would have been different.  The

California Supreme Court's denial of habeas relief on this claim was thus not contrary to, or an

unreasonable application of, federal law, and Berry is not entitled to federal habeas relief.

4.      Failure to object to sentence

In pronouncing Berry's sentence, the court noted that Berry "viciously beat to death the

person who looked at him for her care and protection, for her health."  The court further noted

that "by all accounts, it was a long beating and apparently continued after . . . Wine had slipped

into unconscious[ness] . . . . I don't think there is any doubt that . . . Wine suffered terribly."  On

the assault with a firearm charge, the court sentenced Berry to the upper term of four years based

on "the extent and nature of the injuries which occurred over much of [Wine's] body, disclosing

a high degree of cruelty and viciousness."

Berry argues in his Petition that trial counsel was ineffective for failing to argue that the

judge sentenced him in violation of *Cunningham v. California*, 549 U.S. 270 (2007), by selecting

the upper term on the assault with a firearm count based on findings made by the judge rather

than a jury.  In his Traverse, however, Berry acknowledges that "[R]espondent is right that this

claim appears to be foreclosed by the California legislature's amendment to California Penal

Code § 1170[,] effective March 30, 2007[,] and the Ninth Circuit's subsequent decision in *Butler*

*v. Curry*, 528 F.3d, 652 n.20 (9th Cir. 2008)."  Berry has therefore abandoned this claim, and it

will not be considered by the Court.

-47-

Claim four: Cumulative error

Lastly, Berry argues that the cumulative errors set forth in his Petition warrant reversal of his conviction.  As an initial matter, this claim is unexhausted.  This Court may not consider claims that have not been fairly presented to the state courts.  28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).  To be deemed exhausted, a claim must have been presented to the highest state court that may consider the issue presented.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  To have properly exhausted his state court remedies, Berry must have presented both the legal arguments and their factual bases to the highest state court.  *See Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir. 2003).  As Respondent correctly notes, Berry failed to raise this claim to the California Supreme Court either on direct review or in his exhaustion petition.  Accordingly, Berry has failed to exhaust this claim.

Unexhausted claims must be dismissed.  *See Rhines v. Weber*, 544 U.S. 269, 275-78 (2005).  However, this Court need not rely on this basis as it may deny the petition on the merits notwithstanding the lack of exhaustion of state court remedies.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Accordingly, this Court declines to dismiss the unexhausted claim solely on exhaustion grounds and will instead reach the merits of the claim as discussed below.

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th

-48-

Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection"

occurs where the combined effect of the errors had a "substantial and injurious effect or

influence  in determining the jury's verdict."  *Brecht*, 507 U.S. at 623 (citation omitted).  In other

words, where the combined effect of individually harmless errors renders a criminal defense "far

less persuasive than it might [otherwise] have been," the resulting conviction violates due

process.  *See Chambers*, 401 U.S. at 294.

   As discussed above, Berry does not allege any claims that amount to errors of

constitutional dimension.  Accordingly, he demonstrates no errors that can accumulate to a level

of a constitutional violation, and this Court must deny him relief on this claim.  *See Mancuso v.*

*Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

V. CONCLUSION AND ORDER

   Berry is not entitled to relief on any ground raised in his Amended Petition.

   **IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254

for Writ of Habeas Corpus is **DENIED**.

   **IT IS FURTHER ORDERED THAT** this Court issues a Certificate of Appealability

only with respect to Berry's interrelated claims that the first line of CALJIC 8.51 violated his

right to due process and was not harmless error, and that trial counsel was ineffective in failing to object to that instruction.  This Court declines to issues a Certificate of Appealability with respect to the remainder of Berry's claims.  28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004).  Any further request for a Certificate of Appealability as to the other claims must be addressed to the Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: October 20, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge